IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID E. THOLE | ) |
| JOAN M. THOLE | ) |
| GAIL ANN BALCOM | ) |
| DARRIN J. BOSIN | ) |
| JOHN D. BROOKS | ) |
| JUAN ANTONIO MANRIQUE | ) |
| MARIA V. HUGHES | ) |
| CYNTHIA M. ANTHONY | ) |
| ALFRED ANTHONY | ) |
| MICHAEL W. BASS | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 23-cv-00793 (BAH) |
| | ) |
| THE ISLAMIC REPUBLIC OF IRAN | ) |
| | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO TAKE JUDICIAL
NOTICE OF EVIDENCE IN PRIOR RELATED CASES AND FOR ENTRY OF
DEFAULT JUDGMENT AS TO LIABILITY AND DAMAGES**

Plaintiffs in this case are survivors of the terrorist attack at the United States Air Force

Base in Dhahran, Saudi Arabia, in 1996, and their close family members. This was the "Khobar

Towers" terrorist attack, named after the residential complex where the service members were

housed. The terrorist bombing was materially supported and planned by Defendant the Islamic

Republic of Iran.

The ten plaintiffs who submit this Motion and Memorandum in Support are as follows:

Plaintiff David E. Thole, a Captain in the United States Air Force and a fighter pilot who was

serving as a flight instructor; his wife, Joan M. Thole, also a Captain in the United States Air

Force serving as an intelligence officer; Gail Ann Balcom, Joan Thole's sister; Juan Antonio

Manrique, a crew chief with the 58th Fighter Squadron; Maria V. Hughes, Mr. Manrique's

mother; Michael W. Bass, an Air Force communications specialist; Darrin J. Bosin, a Senior

Airman with responsibility for F-15 avionics; John D. Brooks, a Senior Airman with

responsibility for F-15 avionics;, and Cynthia and Alfred Anthony, who are siblings of George

Anthony, previously awarded damages by this Court in *Akins v Islamic Republic of Iran*, 332 F.

Supp. 3d 1, 102 (D.D.C. 2018) (BAH).

## I.    PLAINTIFFS HAVE PROPERLY SERVED PROCESS ON IRAN, AND IT HAS FAILED TO APPEAR AND IS IN DEFAULT.

Plaintiffs have complied with all requirements for service on Defendant the Islamic Republic

of Iran under 28 U.S.C. Section 1608(a), which provides for service on a foreign sovereign and

its political subdivisions in one of four ways.  The first two, by (1) "special arrangement for

service between the plaintiff and the foreign state," and (2) "in accordance with an applicable

international convention on service of judicial documents," are inapplicable here.[1]  Section

1608(a)(3), requiring attempted service "by sending a copy of the summons and complaint and a

notice of suit, together with a translation of each into the official language of the foreign state, by

any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the

court to the head of the ministry of foreign affairs of the foreign state concerned," was attempted

here.  ECF Docket # 9 (Certificate of Clerk showing transmission by Fedex of summons,

complaint, and notice of suit, along with translations into Farsi, to the head of the ministry of

foreign affairs of Iran.)

---

[1] This Court has repeatedly so held.  E.g., *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 78 (D.D.C. 2017) (BAH) ("Defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service….")

If service cannot be made pursuant to any of the first three subdivisions of Section 1608(a), after the lapse of at least 30 days, subdivision (a)(4) of that provision authorizes "diplomatic service" by requesting the Clerk of the Court to send two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when papers were transmitted."  After the lapse of more than 30 days, the Clerk in this case did transmit the required papers to the State Department.  ECF Docket #12.  On September 27, 2023, the State Department filed with the Clerk of the Court a letter attesting to transmission of the required papers through diplomatic channels pursuant to 28 U.S.C. 1608(a)(4), and a certified copy of the diplomatic note attesting to transmission of the required papers to the foreign minister of Iran on August 28, 2023.  ECF Docket #13.  Thus, "diplomatic service" pursuant to subdivision (a)(4) of Section 1608 of the FSIA was successfully executed on defendant Iran on August 28, 2023.

Accordingly, the requirements for service on defendant Iran of Section 1608 of the Foreign Sovereign Immunities Act have been satisfied.  Pursuant to 28 U.S.C. Section 1608(d), defendants had sixty days after service was effected to answer or otherwise respond.  That time lapsed on October 27, 2023, with no response to this date.  By failing to respond, Defendant is in default.   The Clerk of the Court entered a default in this case on November 6, 2023,  ECF Docket #  15.

Service under the FSIA is sufficient to establish personal jurisdiction over defendant. "The district courts shall have original jurisdiction without regard to amount in controversy of

any nonjury civil action against a foreign state ... as to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."  28 U S.C. Section 1330 (a). "Personal jurisdiction over a foreign state shall exist as to every claim of relief over which the district courts have jurisdiction … where service has been made under [Section] 1608 of this title." 28 U.S.C. Section 1330(b).

Here, as described above, service was successfully accomplished pursuant to Section 1608(a)(4).  Therefore, the Court has personal jurisdiction over defendant Iran. See also, e.g., *Cohen v. Islamic Republic of Iran,* 238 F.Supp.3d 71, 81 (D.D.C. 2017)  ("Personal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C. § 1330 (a) and service of process meets the standards set forth by 28 U.S.C. § 1608.").

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  Courts take uncontroverted factual allegations that are supported by admissible evidence as true. *Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits.").

Plaintiffs submit Declarations supporting their right to entry of judgment herewith. Addendum of Declarations attached herewith.  This Court has held that sworn declarations such as those submitted by plaintiffs herewith are sufficient to satisfy the requirement of the FSIA, 28 U.S.C. Section 1608(e), that a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court."  E.g., *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) and *Weinstein v. Islamic Republic of Iran* 184 F. Supp. 2d 13 at 19 (D.D.C. 2002).  This Court has

endorsed that view as well.  *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 74-75 (D.D.C. 2017) (BAH).  See also *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018)(BAH); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888 (D.D.C. 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020)(Howell, C.J.).

The United States Court of Appeals for the DC Circuit has held that section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), rev'd on other grounds sub nom. *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

## II.     THE COURT MAY TAKE JUDICIAL NOTICE OF EVIDENCE ESTABLISHING THE SAME DEFENDANT'S LIABILITY FOR THE JUNE 25, 1996 TERRORIST ATTACK ON THE KHOBAR TOWERS.

This action arises out of the terrorist attack on June 25, 1996, on the Khobar Towers apartment complex in Dhahran, Saudi Arabia.  All ten moving plaintiffs' claims arise from that same single terrorist bombing attack.  This Court has already found defendant liable for the same terrorist attack in at least eleven prior decisions: *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Estate of Heiser  v. Islamic Republic of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163 (D.D.C. 2010); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888 (D.D.C. 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020)

(Howell, C.J.); *Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020)(Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 U.S. Dist. LEXIS 133262, 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 U.S. Dist. LEXIS 144779, 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 U.S. Dist. LEXIS 19748, 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.).; *Gration v. Islamic Republic of Iran*, No. 21-cv-1859,  2023 U.S. Dist. LEXIS 141944, 2023 WL 5221955 (DDC 2023) (BAH).

In *Blais* and *Estate of Heiser*, supra, the Court heard extensive evidence, including expert testimony, and held that Iran was liable for the same June 25, 1996, terrorist attack on the Khobar Towers at issue in this case.  In the *Rimkus* case, and all other subsequent Khobar cases enumerated above, the Court took judicial notice of the findings in *Blais* and *Heiser* to  impose liability for the same attack  on Iran as well.  Defendant defaulted and did not appear in the *Blais*, *Heiser, Rimkus, Akins, Aceto, Schooley, Christie, Blank, Ackley, Mustard, and Gration* cases, just as it has defaulted and refused to appear in this case.  Plaintiffs here are similarly situated in all respects to plaintiffs in those cases.

Fed. R. Evid. 201 authorizes the Court to take judicial notice of facts previously determined by the court in circumstances such as those presented here.  It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties.  *Veg-Mix Inc. v. U.S. Dept. of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987).  The Court held in the *Heiser* case itself that a court may take judicial notice of related proceedings and records in cases before the same court.  *Heiser*, supra, 466 F.

Supp. 2d at 262-63, quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp.2d 105, 109 n.6 (D.D.C. 2005).

The Court has recognized the appropriateness of taking such judicial notice and entering default judgments as to liability in subsequent cases involving the same terrorist incidents previously adjudicated against the same defendants in default.  E.g., *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 103 (D.D.C. 2007); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009)("this Court may take judicial notice of related proceedings and records in cases before the same court. ") *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010)("the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence"); see also *Murphy v. Islamic Republic of Iran,* No. 06-cv-596 (D.D.C. Oct. 2, 2007); *Estate of Anthony K. Brown v. Islamic Republic of Iran*, No. 08-cv-531 (D.D.C. Feb. 1, 2010).

In *Rimkus,* the Court concluded that judicial notice of findings in the *Heiser* and *Blais* cases would be appropriate because "the history of litigation stemming from the bombing of Khobar Towers … is extensive."  750 F. Supp.2d at 167.  The *Rimkus* court continued:

> Over years of litigation, the plaintiffs in both *Blais* and *Heiser* presented substantial evidence to the Court concerning the Khobar Towers bombing. In *Blais,* the plaintiffs submitted evidence concerning the investigations and opinions of Louis Freeh and Dale Watson. Mr. Freeh was the FBI Director at the time of the bombing, and under his direction the FBI "conducted a massive and thorough investigation of the attack, using over 250 agents." *Blais,* 459 F. Supp. 2d at 48. Mr. Watson was the Deputy Counterterrorism Chief of the FBI in 1996, and subsequent to the attack he became the Section Chief for all international terrorism at the Bureau. He was responsible "for day to day oversight of the FBI investigation" and has given sworn testimony concerning the results of the investigation. *Id.*

750 F. Supp.2d at 168*.*  The *Rimkus* opinion further detailed the evidence it judicially noticed from *Blais* and *Heiser* for holding defendants liable for the Khobar Towers terrorist attack:

In addition, Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau" and expert consultant on terrorism-related issues, was qualified as an expert and gave extensive testimony concerning the defendants' involvement in terrorist activities. *Id.* at 48-49. In *Heiser,* the evidence was even more extensive than in *Blais,* and was presented to a magistrate judge over the course of more than two weeks. *Heiser I,* 466 F. Supp. 2d at 250.   ….

> Based on all of the above evidence, as well as additional documentary and testimonial submissions, the Court in both *Blais* and *Heiser* concluded that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hizbollah to execute the plan… *Id.* at 265; *Blais,* 459 F. Supp. 2d at 48 (quoting with approval Dr. Tefft's conclusion that defendants "were responsible for planning and supporting the attack on the Khobar Towers").

750 F. Supp.2d at 168 (footnote omitted).

Accordingly, plaintiffs' motion asking the Court to take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran for providing material support and resources to the terrorists who attacked the Khobar Towers complex on June 25, 1996, is well-supported and amply-precedented.  There is no reason not to follow those precedents here.

## III.    ALL PLAINTIFFS HAVE SUFFERED PHYSICAL AND PSYCHOLOGICAL INJURIES COVERED BY SECTION 1605A.

The state-sponsored terrorism exception provides a private right of action. The action is available to, among others, nationals of the United States and the legal representatives of such persons. 28 U.S.C. § 1605A(c).  Foreign states that meet subsection (a)(2)(A)(i)'s requirements as "state sponsors of terrorism" may be held liable under subsection (c) "for personal injury or death" caused by the foreign state or its agents.  Id.  "In any such action damages may include economic damages, solatium, pain and suffering, and punitive damages."  Id.

It is well established that Iran is now, and has continuously been since 1984, a state sponsor of terrorism.  Iran was designated by Secretary of State George P. Shultz on January 23,

1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz). This designation meets section 1605A's definition of "state sponsor of terrorism."  28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism,* U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited December 15, 2023).

Although Section 1605A(c) provides a private right of action, it does not itself specify the substantive law to be applied.  This Court has therefore applied "general principles of tort law," looking to authoritative sources such as the Restatement (Second) of Torts.  See, e.g., *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).  These cases have repeatedly and correctly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or "personal injury" is responsible for assault and battery, intentional infliction of emotional distress, and the pain and suffering of both the immediate victims as well as of the immediate family, including solatium and loss of consortium. [2]

In *Akins v. Islamic Republic of Iran*, supra, this Court held that Iran was liable to the service members who were present at the Khobar Towers attack for the torts of assault, battery, and intentional infliction of distress. 332 F. Supp. 2d at 37.  The Court also held Iran liable to the

---

[2] "Under the FSIA, a solatium claim is indistinguishable from" a claim for intentional infliction of emotional distress. *Valore v. Islamic Republic of Iran*, 700 F. Supp 2d at 85.

close family members of those present for intentional infliction of emotional distress, with rights to solatium damages expressly mentioned in Section 1605A(c). Id. at 38.

In *Maalouf v. Islamic Republic of Iran*, 923 F. 3d 1095, 1113 (D.C.Cir. 2019), the DC Circuit squarely held that a defendant that does not appear (as here) cannot benefit from a statute-of-limitations defense: A district court may not "act *sua sponte* to raise affirmative defenses on behalf of defendants who do not appear to defend actions against them."

## IV.  PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES FOR ASSAULT AND BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND SOLATIUM.

All plaintiffs herein who were service members in the Air Force at the time of the terrorist attack were housed at the Khobar Towers residential complex.  Although three of them were performing their duties at the Air Base itself when the blast hit, all felt and heard the blast and felt an immediate apprehension of harm.  All plaintiffs, including family members who were not present, suffered from the intentional infliction of emotional distress.

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. Restatement (Second) of Torts § 46(1); see also *Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); see also *Valore*, 700 F. Supp. 2d at 77 (same).

In *Schooley*, this Court relied in part on an "objective metric" — the VA disability rating — to "determin[e] the relative degree of injury suffered by each service-member plaintiff." *Schooley*, 2019 WL 2717888, at *74.  That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military

10

service." *Id*. (internal quotation marks omitted).  As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards.  *Id*.

The Court continued, "[t]hus, service member plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40-60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member plaintiffs rated 70-100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *Schooley*, 2019 WL 2717888, at *75. The remaining servicemember plaintiffs will be awarded damages based on the descriptive and documentary evidence presented." Id. This Court followed essentially the same approach in *Christie, Aceto, Mustard,* and *Gration*  as well.

As the attached Declarations show, Plaintiffs herein must be awarded substantial compensatory damages.

<u>Plaintiffs David Thole and Joan Thole and one Family Member</u>

David Thole was sitting right next to the sliding glass door of his room at the Khobar Towers when it exploded inward, cutting him badly.  His most serious wound was a large piece of glass that lodged in his neck, causing him to bleed profusely.  He was evacuated almost immediately to the nearest Saudi hospital, where he received life-saving emergency surgery on the floor of the emergency room without benefit of anesthesia.  His wife Joan Thole, who was sitting in the same room at the time, also received many cuts and abrasions from flying glass, the most serious of which severed a tendon in her right arm.  She received surgery at the same hospital the very next morning, under general anesthesia.  She wore a cast for six weeks and had

to undergo extensive physical therapy thereafter to try to recover full use of her hand.  She noticed small pieces of glass emerging from her face for weeks afterwards.

David and Joan both have residual physical scars and psychological after-effects.  David felt pieces of glass emerge from the back of his head and neck for months afterwards.  Joan's severed tendon permanently weakened and stiffened her right arm and hand, which still causes her pain.  Both David and Joan have some symptoms of PTSD, including an aversion to loud noises such as fireworks.  However, neither has sought diagnosis or treatment. They preferred to get on with their lives and raise a family.

Being husband and wife, both David and Joan suffered not only from their own wounds, but also from concern and emotional distress for each other's condition.  They were separated from each other at the first "triage" station set up in the Khobar mess hall.  David was taken away in an ambulance almost immediately for life-saving surgery.  Joan did not know what had happened to David until after her own surgery the next day.  All she knew was that he was bleeding profusely from the neck and taken away in an ambulance.  David, for his part, also did not know the full extent of his wife's injuries until the next day.  During the ambulance transport to the hospital, he could not get the image of his wife's face covered with blood out of his mind.

David and Joan should be awarded damages both for their own injuries and for the emotional distress they each individually experienced as a result of their spouse's injuries, separately.  Each suffered acute emotional distress from being present at the time of the other's injuries, and then being separated without knowing exactly what happened to the other.  Each is no less deserving of separate emotional distress injuries than those spouses who, in many similar prior cases, were awarded emotional distress and "solatium" damages even though they were not

present at their spouse's injuries and only heard about the attack remotely through news reports or phone calls.

Gail Balcom, Joan Thole's sister, was a close and loving family member who first heard about the terrorist attack from a panicked call received from their mother. She was deeply worried and concerned, especially when she turned on the television news and saw the scenes of devastation and rubble in the aftermath of the bombing. She experienced a terrible and agonizing ordeal until she finally received word that her sister Joan and her brother-in-law David had survived, although with injuries.

### Juan Antonio Manrique and one Family Member

Juan Manrique was a crew chief with the 58th Fighter Squadron. He was doing a rotation at Dhahran and was housed in the Khobar Towers. When the blast hit, he was standing in his bathroom, shaving. The window next to him blew in and he felt the ground shake and heard a deafening blast. He felt the shock wave and an immediate apprehension of harm. When he stumbled out of the bathroom, he saw his roommate covered with blood and his Chief Master Sergeant with blood squirting out of his neck. He helped them both evacuate down the stairs and went back to see if he could help others. Later he learned that five of his close friends had died in the blast.

Mr. Manrique began to show symptoms of PTSD while still in the Air Force, and continues to struggle with it today. He has a VA disability rating of 90 percent, which includes a 50 percent disability based on his PTSD. Manrique Declaration Paragraph 11 and Exhibits A and B thereto.

Mr. Manrique's mother, Maria Hughes, first heard about the terrorist attack on the television news. She wasn't sure the attack had occurred at her son's air base, but received a

phone call from her eldest son, also serving in the Air Force, that confirmed the attack had happened at her son's base. When she heard that, she felt weak in the knees, and began to shake and cry. She recalls not hearing anything further for several hours, until she finally heard from her son's fiancé that he was alright. She then recalls receiving a call from him directly to let her know he was ok, and asking him to repeat that good news to her over and over again. When her son returned, she sensed he was changed. He was quick to anger and seemed on edge. She felt she had lost the happy and active young man who had been her son.

Mike Bass

Mike Bass was a communications specialist with special expertise in satellite and RF communications. He had volunteered to serve at Dhahran because he knew the Air Force needed his skills and expertise there. On June 25, 1996, he was working the night shift at the mobile communications center at the Air Base when the truck bomb exploded. The blast hit the building where he was working, and the whole building shook and rattled as though a semi truck had hit it. He thought they were under attack and felt an immediate apprehension of harm. They had lost all power and communications. He went outside and gathered personnel to restart the generators. He saw the glow in the sky toward the residential Khobar Towers and had a bad feeling about what must have happened, but had no time to reflect as his first priority was to restore communications as quickly and completely as possible, which he was able to do within a reasonably short time.

The next morning when he returned to the Khobar Towers he saw the devastation first hand. There was dust, debris, damaged buildings, broken windows, and marks of blood everywhere. He helped the wounded, and helped with the clean-up effort.

14

Mr. Bass has not sought any PTSD counseling or therapy because of concerns that it might detrimentally affect his career. However, he has PTSD symptoms, including sleep issues and fear of and a startle reaction to loud noises. He believes that what he experienced and saw in the aftermath of the attack had a deep and possibly detrimental effect on him. He has tried to suppress the effects of what he went through, but it affected him deeply and has left mental scars.

Mr. Bass was honored to receive an "Airman of the Year" commendation for his work in quickly and effectively restoring the Air Base's communications after the attack.

John Brooks

John Brooks was a roommate and close friend of Earl Cartrett, Jr., one of the nineteen Airmen who lost their lives in the attack. Mr. Cartrett and Mr. Brooks were preparing to conclude their rotation at Dharhan, and Mr. Cartrett had offered to pack both their belongings so they could be ready for the flight home. This allowed Mr. Brooks to serve his normal night shift at a hangar at the Air Base, where he worked on F-15 avionics. On that night, Mr. Brooks suddenly felt the ground shake and heard an enormous blast. The large and heavy door to the hangar cracked open by itself but then closed. Mr. Brooks felt an immediate apprehension of harm, fearing that there would be incoming missiles to follow the initial blast. He could see the mushroom cloud forming over the residential quarters at Khobar, and immediately knew that many of his comrades were undoubtedly badly hurt.

He worked through the night to prepare the fighter planes for action. He heard there had been fatalities but nothing about who may have been killed for a long time. Although his roommate's death was not confirmed until later, he had a bad feeling about him because he heard nothing from him or about him. When his roommate's death was confirmed, he was overcome with grief and anger. This was the lowest point of his life.

15

Mr. Brooks began to have hallucinations.  For weeks afterwards, he would see his roommate Mr. Cartrett's face seemingly looking out at him from the television or other screens. He had nightmares and insomnia.  He was first diagnosed with PTSD upon his return to Eglin Air Force Base in 1996.  He has sought treatment for PTSD from time to time since then. Attached as Exhibit A to his Declaration is a "Psychological Assessment" issued by a psychologist at the VA in 2018.  It traces his PTSD to the Khobar Towers attack and notes that his roommate there was killed.  It states that his "PTSD screening test… was positive," with a "score=4."[3] It notes that he had "nightmares  about it and thought about it even if he didn't want to;" that "he tried hard not to think about it, and tried to avoid situations that reminded him of it;" that he "was constantly on guard, watchful, or easily startled;" and that he "felt numb or detached from others, activities, or his surroundings." Exhibit A to Brooks Declaration.

Mr. Brooks reports numerous other PTSD symptoms, including difficulties with social and family relationships, anger management issues, and fear of and avoidance of loud noises. Mr. Brooks has only relatively recently applied for a VA disability rating but has not yet at the date of this submission received a disability rating.  He believes that the rating will be issued within the next month or so, based on a timeline generally followed by the VA, and we hope to have an opportunity to supplement his Declaration when the VA disability rating is received.

---

[3] The American Psychiatric Association has issued Scoring and Interpretation Guidelines for PTSD:  "Each item on the measure is rated on a 5-point scale (0=Not at all; 1=A little bit; 2=Moderately; 3=Quite a bit, and 4=Extremely)." Primary Care PTSD Screen for DSM-5 (PC-PTSD-5) See *https://www.ptsd.va.gov/professional/assessment/screens/pc-ptsd.asp*, last visited Dec. 15, 2023.

Darrin J. Bosin

Mr. Bosin was a decorated and dedicated Senior Airman with responsibility for F-15

avionics.  He was on his second rotation at the Dhahran air base in 1996.  He was best friends

with both John Brooks and Earl Cartrett, Jr., and they were his "second set of roommates."  On

June 25, 1996, he was working a night shift at a hangar at the air base when he felt a huge blast

wave hit, and felt the ground shake and the whole building rattle and move. He was startled and

scared, believing they were under attack and that SCUD missiles were incoming.  The shift

supervisor started to pass out rifles and ordered him to prepare fighter jets for launch.  He went

outside briefly and had a bad feeling about what must have happened when he saw the smoke

rising above the Khobar Towers residential complex.

After working through the night, he returned to the Khobar residential complex and could

not believe the devastation he saw there. Building 131, where he spent most his time with his

friends Mr. Cartrett and Mr. Brooks, was almost completely destroyed, with one whole face of

the building completely sheered off.  There was rubble, broken glass, and signs of blood almost

everywhere. What he saw, smelled and tasted that day will never leave him.  Those things recur

to him in his nightmares and in intrusive images.  When he was able to visit his own room, he

saw that a 100 lb. air conditioner had been thrown across the room and landed on his pillow—

had he been sleeping there, he would have been decapitated.

Mr. Bosin was assigned to the "casket detail" and helped load nineteen caskets on to the

air transport back to Florida.  At the time, he did not know that one of the caskets contained the

remains of his close friend Earl Cartrett, Jr.  When he later learned that, he felt an overwhelming

sense of loss and grief, matched only by his anger directed at those who had perpetrated the

attack.  In the years afterwards, he engaged in many risky behaviors, apparently trying to "outrun" the grief and trauma he had experienced.

He was initially formally diagnosed with PTSD on his return to Eglin Air Force Base in 1996 and has received some treatment for PTSD off and on since that time.  He has nightmares, anger management issues, trust issues, and survivor's guilt.  In 2002, one of the times he sought treatment, he was assigned to be treated at a PTSD Clinic of the VA.  Exhibit A to Bosin Declaration.  Some clinical notes from that time describe his "disturbing dreams about his best friend who died in the bombing," and that he would have "various things trigger emotions associated with the bombing."  Id.  More recently, he has been attending a PTSD Clinic again, where his therapy has included "Prolonged Exposure" and "Skills Training in Affective and Interpersonal Regulation."  Exhibit C.  He has also applied for but not yet received a VA Disability rating.  Exhibit B.  As with Mr. Brooks, Mr. Bosin believes that the rating will be issued within the next month or so, based on a timeline generally followed by the VA, and we hope to have an opportunity to supplement his Declaration when the VA disability rating is received.

Cynthia and Alfred Anthony, Siblings of George C. Anthony

Cynthia Anthony is a sister, and Alfed Anthony is a brother, of George C. Anthony. George C. Anthony is an Air Force service member severely injured in the Khobar Towers attack.  He was previously before this Court in *Akins v Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (BAH).  In that case, the Court awarded him $5 million in compensatory damages for his injuries.  332 F. Supp.3d at 102.

Cynthia Anthony reports that she was very close with George growing up and stayed in touch with him after his enlistment.  She would always return to their parents' house when

18

George came back on leave to see him and catch up.  The day she first heard of the Khobar

Towers attack was a memorable one for her, because she had been visiting their parents' house

to share with them the good news that she was pregnant.  The good feelings quickly became

somber on that day when her parents received a phone call from George's wife informing them

of the bombing at the Khobar Towers.  She said there had been a truck bomb but that there was

no word of what may have happened to George.  Her parents were devastated, and Cynthia

shared their deep concern.  The family had lost Cynthia's younger brother Gregory in an

automobile accident just a few years before and everyone was distraught that George may have

lost his life as well.  It was a difficult and agonizing time for all of them.  When they finally

heard about 24 hours later that, although George was injured, he had survived, they were

overjoyed.

When she first saw George after his return home, Cynthia sensed there were some deep

psychological scars.  He was not the same as before, and seemed "closed off" from her and the

rest of the family.

Alfred Anthony was the oldest brother in the family. George was two years younger, and

Gregory was another year younger.  All three of the boys grew up sharing a bedroom. They did

everything together—Church, sports, and play.  The family suffered a blow when Gregory died

in an automobile accident.  Alfred stayed in close touch with George even after he enlisted in the

Air Force.  He was sad when George left and he returned to the shared brothers' bedroom, which

now held only Alfred.

Alfred was at work on June 25, 1996, when he received a phone call from their father

informing him of the bombing at the Khobar Towers.  Their father said he didn't know anything

about what happened to George at that time.  Alfred felt terrible, thinking he had already lost one

brother and hoping that he had not just lost another.  He prayed that George was ok.  It was a very long night and next day before Alfred heard the news that his brother George had survived.  When he next saw him, he felt that George was less communicative, and seemed still in shock.  He felt that they had lost a piece of him that never came back.

## V. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES.

In *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1610 (2020), the Supreme Court decided that punitive damages may be awarded "retroactively" in circumstances such as those present here.  Following *Opati*, this Court has awarded such punitive damages.  E.g. *Christie v. Islamic Republic of Iran, supra*, 2020 U.S. Dist. LEXIS 116378 at  *93; *Blank*, 2021 U.S. Dist. LEXIS 133262, 2021 WL 3021450, at *10.  There, the Court awarded punitive damages equal to compensatory damages apportioned among the plaintiffs in an amount proportional to their compensatory damages.  Plaintiffs before the Court here should be awarded the same measure of punitive damages as well.

## VI. PLAINTIFFS ARE ENTITLED TO PREJUDGMENT INTEREST.

In *Christie*, this Court awarded prejudgment interest from the date of the terrorist attack—June 25, 1996—to the date of the judgment rendered.  There, this Court reasoned as follows:  "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations [citing *Oveissi II*, 879 F. Supp. 2d at 56].[4]  <u>In cases like this one, the general practice has been to award prejudgment interest.</u>"  *Christie*, *supra*, at **62-63, emphasis added.[5]  The Court should do the same here.

---

[4] *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012).

[5] <u>But see</u>, e.g., *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020); *Gration*, supra, at *113-14 *contra*.

## **CONCLUSION**

For all the reasons stated, the Court should take judicial notice of findings of fact and

conclusions of law in related similar cases, and should enter a final judgment against Defendant

Iran and in favor of each plaintiff in amounts consistent with its prior precedent and practice,

awarding compensatory damages, punitive damages, and prejudgment interest.


Respectfully submitted,

/S/__Paul G. Gaston_____
Paul G. Gaston, DC Bar #290833
LAW OFFICES PAUL G. GASTON
1101 Connecticut Avenue, NW, Suite 450
Washington DC 20036
202-296-5856
paul@gastonlawoffice.com

*Attorney for Plaintiffs*