## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID E. THOLE, *et al.*, | |
| Plaintiffs, | Civil Action No. 23-793 |
| v. | Judge Beryl A. Howell |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

This action brought by ten plaintiffs arises out of the bombing on June 25, 1996, of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. Pls.' Complaint ("Compl.") at Intro., ECF No. 1. The explosion killed nineteen American servicemembers and injured many others, including six servicemember plaintiffs in this case. *Id.* The remaining four plaintiffs are immediate family members of servicemembers harmed in the attack, including two of the servicemember plaintiffs in this lawsuit and one servicemember who was a plaintiff in *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.). *See id.* at 2; ¶ 10. Plaintiffs allege that defendant, the Islamic Republic of Iran, is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for its material support of Hezbollah terrorists that bombed the Khobar Towers complex. *Id.* ¶¶ 14, 16. Although plaintiffs have complied with the FSIA's requirements for service, Iran has failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 13; Clerk's Entry of Default, ECF No. 15. Plaintiffs now seek default judgment against defendant as to liability and damages. *See* Pls.' Mot. for Entry of

Default J. and to Take Judicial Notice of Evidence in Related Prior Cases ("Pls.' Mot.") at 1, ECF No. 16.  For the reasons detailed below, plaintiffs' motion is granted.[1]

I.   **BACKGROUND**

Twelve prior decisions of this Court have found defendant liable for the Khobar Towers bombing:  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, J.); *Akins v. Islamic Republic of Iran* ("*Akins I*"), 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie*, 2020 WL 3606273; *Akins v. Islamic Republic of Iran* ("*Akins II*"), 549 F. Supp. 3d 104 (D.D.C. July 16, 2021) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) (Howell, J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony.  *See Blais*, 459 F. Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the offering of evidence took seventeen days, which included examination of witnesses, including seven expert witnesses.

---

[1]   Plaintiffs also have pending their Motion to Expedite, ECF No. 19, which is denied as moot, given the resolution in this Memorandum Opinion of their motion for default judgment.

*See* 466 F. Supp. 2d at 250.[2]  *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 167; *Akins I*, 332 F. Supp. 3d at 10; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here argue that "[a]ll ten moving plaintiffs' claims arise from that same single terrorist bombing attack" and "ask[] the Court to take judicial notice of prior findings of fact and supporting evidence" of the prior related proceedings.  Pls.' Mem. in Supp. of Mot. to Take Judicial Notice of Evidence in Prior Related Cases and for Entry of Default J. as to Liability and Damages ("Pls.' Mem.") at 5, 8, ECF No. 16-1.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).[3]  Rule 201 is used frequently to notice judicially factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins I*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  This avoids "the formality of having that evidence reproduced."  *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C.

---

[2]      The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

[3]      "[A]djudicative facts are simply the facts of the particular case."  *Nat'l Org. for Women, Wash., D.C. Chapter v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, C.J., concurring) (quoting FED. R. EVID. 201(a), Advisory Committee Note).  The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

2011) (citing *Rimkus II*, 750 F. Supp. 2d at 172); *see also Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases").  Taking judicial notice of prior findings "does not conclusively establish the facts found in those cases" in the later FSIA case.  *Foley*, 249 F. Supp. 3d at 191.  Rather, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact."  *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp. 2d at 172. In fact, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them."  *Rimkus*, 750 F. Supp. 2d at 172.[4]

This Court is persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins I*, 332 F. Supp. 3d at 11, and will therefore grant plaintiffs' request to take judicial notice of the evidence presented in *Mustard*, 2023 WL 1778193; *Ackley*, 2022 WL 3354720; *Blank*, 2021 WL 3021450; *Akins II*, 549 F. Supp. 3d 104; *Christie*, 2020 WL 3606273; *Aceto*, 2020 WL 619925; *Schooley*, 2019 WL 2717888; *Akins I*, 332 F. Supp. 3d 1; *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010) (Lamberth, J.); *Rimkus*, 575 F. Supp. 2d at 181; *Heiser I,* 466 F. Supp. 2d 229; and *Blais*, 459 F.

---

[4]        The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases.  In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice.  774 F.3d 1044, 1049 (D.C. Cir. 2014); *see also id.* 1051.

Supp. 2d 40; *see Akins I*, 332 F. Supp. 3d at 11 (stating that "factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case.").  The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

### A. The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47.  Just before 10:00 p.m. on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 21. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 21.  The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "caused structural damage in buildings a quarter mile away," Compl. ¶ 21.  Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT.  The [U.S. Department of Defense] said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶¶ 20–22.

### B. Defendant Iran's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47 (citation omitted); *see, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited May 15,

2024).  Prior proceedings have found that Iran planned and supported the Khobar Towers

bombing.[5]  Both Ayatollah Ali Khamenei, the Supreme Leader of Iran at the time, and the

Minister of Intelligence and Security "approved" the attack.  *Heiser I*, 466 F. Supp. 2d at 252.

The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by

the [Iranian Revolutionary Guard Corps ('IRGC')] and by the terrorist organization known as

Hezbollah," with the individuals who carried out the bombing calling themselves "Saudi

Hezbollah."  *Id.*

        These conclusions are based in part on the testimony of four key expert witnesses in *Blais*

and *Heiser I*.  Louis Freeh, who was director of the FBI at the time of the bombing, and Dale

Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their

oversight of the FBI's "massive and thorough investigation of the attack, using over 250 agents."

*Id.*; *see also id.* at 260–62.  "Based on that investigation, an Alexandria, Virginia, grand jury

returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah

organization."  *Id.* at 252.  During its investigation, the FBI interviewed six members of Saudi

Hezbollah who "admitted to the FBI their complicity in the attack on the Khobar Towers, and

admitted that senior officials in the Iranian government provided them with funding, planning,

training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers."  *Id.* at

253.  Both Freeh and Watson testified to their conclusions, based on information gathered in

their investigations, that "Iran, [the Ministry of Information and Security ('MOIS')], and IRGC

were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah."  *Id.* at 264.

        Further, Dr. Patrick Clawson provided expert testimony in *Heiser I* that "the government

of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi

---

[5]        Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C.
§ 1605A(c).

Hezbollah carried out the attack under their direction."  *Id.* at 253.  This conclusion was "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.*  Dr. Bruce Tefft, a former member of the CIA's counterterrorism bureau, supported Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers."  *Id.* at 253–54.

### C.  The Instant Plaintiffs

Plaintiffs in this action include six servicemembers who suffered from physical and/or psychological injuries as a result of the Khobar Towers bombing and four immediate family members of those servicemembers and one other servicemember injured in the attack.  *See* Compl. at Intro.  The servicemember plaintiffs and family-member plaintiffs are described below.

#### 1.  *David E. Thole*

On June 25, 1996, David E. Thole ("D. Thole") was serving as a Captain and Flight Instructor Fighter Pilot, in the United States Air Force, stationed in Dhahran, Saudi Arabia, and quartered in the Khobar Towers complex.  Compl. ¶ 3.  On the night of the attack, then-Captain D. Thole was sitting in the day room of his quarters inside the Khobar Towers complex, next to the sliding glass doors in the room.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of David E. Thole (Nov. 14, 2023) ("D. Thole Decl.") ¶ 7, ECF No. 16-2.  D. Thole "[s]uddenly . . . felt the ground shake" and then described an explosion that caused the glass from the doors to "hit[] [him] with tremendous force."  *Id.*  He immediately went to check on his wife, Joan ("J. Thole"), who resided with him, and saw that she was covered in blood.  *Id.* ¶ 8.  D. Thole and J. Thole moved

7

to seek shelter in the bathroom, the innermost room in their quarters, where J. Thole noticed D. Thole was "bleeding profusely from the right side of [his] neck, and helped [him] apply pressure to the wound with a towel." *Id.* ¶ 9.  D. Thole and J. Thole then evacuated the building and went to a medic station for treatment, where D. Thole was immediately taken by ambulance to the local Saudi hospital. *Id.* ¶ 10.  On the way to the hospital, D. Thole remained in distress as he "worried about Joanie" and found that "[t]he image of her blood-soaked face after the blast remained in [his] mind, and caused [him] severe emotional distress and worry." *Id.* ¶ 11.  Upon arrival at the hospital, D. Thole was taken inside on a stretcher and underwent immediate emergency surgery "on the floor of the emergency room, [which] probably saved [his] life." *Id.* ¶ 13.  D. Thole was not under anesthesia during the surgery, which "consisted of two layers of sutures," one deep inside his wound and one closer to the surface. *Id.*  Once D. Thole regained consciousness, he received additional treatment for larger pieces of glass lodged in the back of his head and cuts on his feet. *Id.* ¶ 14.

D. Thole and J. Thole were eventually evacuated to a U.S. military hospital in Germany, where D. Thole was told by the examining doctor that he "was very lucky to be alive, because many patients who had the same injury would not have made it." *Id.* ¶ 16.  He was awarded a Purple Heart for his injuries from the attack. *Id.* ¶ 20; *see also id.*, Ex. to David. E. Thole Decl. (D. Thole's Purple Heart Certificate).  Many months after the Khobar Towers bombing, D. Thole continued to feel small pieces of glass coming out of the back of his head and neck, and experienced numbness on the right side of his face due to a nerve that had been severed. *Id.* ¶ 17.  Though he never sought Post-Traumatic Stress Disorder ("PTSD") treatment, he experiences psychological after-effects from the bombing, including an inability to sit near large glass windows, and a strong aversion to loud and sudden noises, including fireworks. *Id.* ¶ 19.

### 2. *Joan M. Thole and One Family Member*

On June 25, 1996, Joan M. Thole ("J. Thole") was serving as a Captain and Target Intelligence Officer, in the United States Air Force, stationed in Dhahran, Saudi Arabia and quartered in the Khobar Towers complex.  Compl. ¶ 4.  She was assigned to the base in Dhahran, Saudi Arabia upon her request so that she could serve alongside her husband, D. Thole, who was also stationed there.  *Id.*  On the night of the attack, then-Captain J. Thole, like D. Thole, was sitting in the day room of their quarters, which contained sliding glass doors.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of Joan M. Thole (Nov. 16, 2023) ("J. Thole Decl.") ¶ 5, ECF No. 16-2.  J. Thole "hear[d] the immense explosion as the glass from the sliding glass doors of the day room expoded towards [her] in many small pieces."  *Id*. ¶ 5.  J. Thole was struck by pieces of flying glass, which became embedded primarily in her "right arm and hand, and [her] face."  *Id*. Following the explosion, J. Thole realized she was bleeding, and began searching for D. Thole, whom she observed "bleeding profusely from a wound in his neck."  *Id.* ¶ 6.  J. Thole and D. Thole sought refuge in the bathroom on the other side of their apartment before deciding to leave the building.  *Id.* ¶ 7.

Once outside, J. Thole sought medical care for D. Thole's neck injury and bleeding, and herself received first aid and sutures for wounds she sustained on her right arm.  *Id.*  D. Thole was subsequently transported to the hospital for further treatment, leaving J. Thole in distress as she "was not even sure that he would make it because he had lost so much blood already."  *Id.* ¶ 8.  J. Thole had no way to communicate with D. Thole and described the series of events as "an agonizing time for [her] and [she] did not sleep that night at all."  *Id.*

The next day, J. Thole was taken to a nearby hospital, where she underwent surgery to re-attach the tendons of two fingers on her right hand, which had been severed by flying glass during the explosion.  *Id.* ¶ 9.  Her right hand and forearm were put in a cast for six weeks.  *Id.*

¶¶ 9, 12.  J. Thole and D. Thole were then evacuated to Germany and then to Hill Air Force Base in Utah, following which J. Thole went to physical therapy on an ongoing basis to "regain full use of [her] right hand."  *Id.* ¶ 12.  Even now, she experiences pain and stiffness in her right hand and often uses her left hand as a result.  *Id.* ¶ 12.  Additionally, she still has scars on her forehead and right forearm from the explosion.  *Id* ¶ 13.  She experiences certain PTSD symptoms and is frightened by loud noises, like fireworks, and large crowds.  *Id.* ¶ 14.  After her return to the United States, J. Thole was awarded a Purple Heart for her injuries from the attack, making her and D. Thole "the only married couple to have each been awarded a Purple Heart for the same incident at the time they were married."  *Id.* ¶ 15.

J. Thole's sister, Gail Ann Balcom, learned about the attack when she received a distressed phone call from their mother explaining that a terrorist attack had occurred at Khobar Towers.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of Gail Ann Balcom (Oct. 25, 2023) ("Balcom Decl.") ¶ 7, ECF No. 16-2.  Balcom and her mother knew that J. Thole and D. Thole, her sister and brother-in-law, had been at Khobar Towers but knew no further information about their condition.  *Id.*  "The uncertainty and lack of knowledge was agonizing" for Balcom, especially after she "turned on the television news and saw the devastation of the collapsed buildings and the rubble."  *Id.*  After more than 24 hours, Balcom and her mother learned that J. Thole and D. Thole were injured in the attack and needed surgery, but that they would be okay.  *Id.* ¶ 8.  When Balcom saw J. Thole upon her return to the United States, she sensed that J. Thole had become "different in some ways," *id.* ¶ 9, harboring a deep anger for what happened toward both the Iranian terrorists and the Air Force for insufficiently protecting servicemembers, *id.*  Despite the consequences of the attack, Balcom believes that her sister and brother-in-law have been "incredibly resilient" and she remains close with J. Thole and admires her deeply.  *Id.* ¶ 10.

10

### 3. *Juan Antonio Manrique and One Family Member*

On June 25, 1996, Juan Antonio Manrique was a Crew Chief with the 58th Fighter Squadron of the U.S. Air Force based in Florida, and had been stationed at the base in Dhahran, Saudi Arabia for three months.  Compl. ¶ 6.  On the night of the attack, Manrique was shaving in the bathroom of his quarters inside the Khobar Towers complex when the explosion occurred.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of Juan Antonio Manrique (Oct. 10, 2023) ("Manrique Decl.") ¶ 5, ECF No. 16-2.  The glass window of his bathroom blew in, and Manrique was "shaken and jarred by the blast wave and deafening boom."  *Id.* ¶ 5.  Manrique immediately became apprehensive, fearing further blasts, and saw his roommate covered in blood outside the bathroom, *id.* ¶¶ 5–6, along with his Chief Master Seargeant walking down the hall with "blood squirting out of his neck," *id.* ¶ 6.  Once Manrique left the building, he observed many more wounded people outside and decided to re-enter the building, whose halls were covered in blood, to help others escape and bring water to those needing it.  *Id.* ¶ 7.

Following the attack, Manrique learned that the casualties included five of his close friends and saw nineteen caskets loaded with the bodies of his comrades on a military transport.  *Id.* ¶ 8.  Upon returning to Florida, Manrique "felt a deep sense of loss and anger," which counseling did little to alleviate.  *Id.* ¶ 9.  He started to show PTSD symptoms while still serving in the Air Force, and continues to suffer from PTSD today.  *Id.* ¶ 10.  His PTSD has caused him to become hypervigilant, destroyed many of his relationships, including his marriage, affects his ability to work, and causes nightmares.  *Id.* ¶ 10.  The VA has rated him as 90% disabled, with 50% based on his PTSD.  *Id.* ¶ 11.

Juan Antonio Manrique's mother, Maria V. Hughes, was uncertain whether her son was stationed at Khobar Towers when she first heard about the attack.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of Maria V. Hughes (Oct. 27, 2023) ("Hughes Decl.") ¶ 8, ECF No. 16-2.  She went to her

sister-in-law's house to watch the news until she heard from her oldest son, who was also in the Air Force and told her that the attack was indeed at Manrique's base. *Id.* ¶¶ 8–9.  Upon hearing this news she "felt [her]self going weak in the knees," because she "had seen the horrible images on the news of the buildings almost completely destroyed." *Id.* ¶ 9.  She subsequently "began to shake and cry" and experienced "pain and anxiety" while waiting hours to find out if Manrique was okay. *Id.* ¶¶ 9–10.  When Manrique returned to the United States, Hughes felt that he had become more angry, irritable, and on edge, and no longer resembled "the same happy and active young man" he once was. *Id.* ¶ 11.  She feels that Manrique's therapy for PTSD has helped him become more patient and understanding. *Id.* ¶ 12.

### 4.  *John D. Brooks*

John D. Brooks was serving as an F-15 Avionics, Communication, Navigation, and Electronic Warfare Journeyman at the base in Dhahran, Saudi Arabia on June 25, 1996.  Compl. ¶ 8.  While at the base, Brooks's roommate was Earl Cartrett, Jr, with whom Brooks was extremely close.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of John D. Brooks (Dec. 6, 2023) ("Brooks Decl.") ¶ 4, ECF No. 16-2.  At the time of the attack, Brooks was working his "normal night shift at the Dhahran Air base a few kilometers away from [their] Khobar Towers residence." *Id.* ¶ 5.  Brooks described feeling the ground shake and hearing a loud blast. *Id.* ¶ 6.  He looked outside and saw "an enormous mushroom cloud rising above the Khobar Towers." *Id.*  He immediately felt apprehensive and thought the base would be hit by missiles. *Id.* ¶ 6.  He stayed at the Dharan Air base for a few hours after the attack with little information about what had happened or who was killed. *Id.* ¶¶ 7–8.  A few days later, Brooks learned that Cartrett was killed, and was "overcome with grief and anger," describing it as "the worst moment of his life." *Id.* ¶¶ 10–11.  Following the attack, Brooks began to suffer from hallucinations, including some involving Cartrett. *Id.* ¶ 12.  Brooks was screened for PTSD and received a "positive" result

with a score of 4 when he returned to Eglin Air Force base in 1996. *Id.* ¶ 13. He has periodically sought treatment for his PTSD, and besides nightmares and insomnia, suffers difficulties with "social and family relationships, anger management isssues, and fear of and avoidance of loud noises." *Id.* ¶ 14. He has been rated by the VA with 50 percent service-related disability from his PTSD, and a total 60 percent disability rating for all of his service related injuries. Suppl. Decl. of John D. Brooks (May 1, 2024) ("Suppl. Brooks Decl.") ¶ 5, ECF No. 17-1.

### 5. *Darrin J. Bosin*

On June 25, 1996, Darrin J. Bosin was a Senior Airman on his second rotation at the base in Dhahran, Saudi Arabia. Compl. ¶ 9. While stationed at Dharan, Bosin was best friends with both Cartrette and Brooks. Pls.' Mot., Ex. 1, Pls.' Decls., Decl. of Darrin J. Bosin (Dec. 7, 2023) ("D. Bosin Decl.") ¶ 4, ECF No. 16-2. On the night of the attack, Bosin was working a night shift at an Air Base a few miles from Khobar Towers. *Id.* ¶ 5. During the attack, he felt a huge blast and the ground shaking, became "startled and scared," and was apprehensive of incoming missiles. *Id.* When he went outside, he saw a large plume of smoke coming from the Khobar Towers residence. *Id.* Bosin and his team immediately began preparing their jets for war and were in a communication "dead-zone," not knowing the details of what had happened at Khobar Towers. *Id.* At first, it was reported that Bosin himself had been killed in the bombing, causing trauma to his mother and father, until Bosin was able personally to place a call home three days after the attack. *Id.* After working several hours to prepare jets for combat, Bosin was tasked with returning to Khobar Towers to help with rescue and aid efforts. *Id.* ¶ 6. He saw that the "floors were covered in [his] friends' blood" and witnessed debris and destruction everywhere. *Id.* Bosin then returned to the hangar at which he was working and turned it into a shelter and triage center. *Id.* ¶ 7. Later, he was assigned to the "casket detail" and was responsible for

helping "load all 19 caskets on the military transport back home." *Id.* ¶ 8.  When he learned that Cartrette was in one of the caskets he loaded, Bosin felt a strong sense of grief and loss that has not abated in the more than 27 years since the attack.  *Id.*

After the bombing, Bosin began to engage in risky behaviors, including motorcycle racing and using alcohol to cope.  *Id.* ¶ 10.  He was diagnosed with PTSD by the VA and has "nightmares, anger management issues, trust issues, and survivor's guilt."  *Id.* ¶ 11.  He currently sees both a psychologist and psychiatrist routinely, but has not yet received a disability rating from the VA due to his PTSD.  *Id.* ¶ 12; *see* Suppl. Decl. of Darrin J. Bosin ("Suppl. Bosin. Decl.") ¶ 10, ECF No. 18-1.  His benefits case worker, however, has advised Bosin that a rating of 100% disability is anticipated based on his PTSD, ulcerative colitis, and gasteroesophageal reflux disease.  Bosin Decl. ¶ 12.

### 6.  *Cyntia M. Anthony and Alfred Anthony*

Cyntia M. Anthony ("C. Anthony") is the sister of George Anthony ("G. Anthony"), who was a victim of the Khobar Towers attack on June 25, 1996, and was awarded damages by the Court in a separate lawsuit.  *See* Compl. ¶ 10; *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 47 (D.D.C. 2018) (awarding George C. Anthony $5,000,000 in pain and suffering damages due to severe physical and emotional injury).  Growing up, C. Anthony was close to her siblings, including G. Athony, and they all spent a lot of time together.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. Cyntia M. Anthony (Nov. 14, 2023) ("C. Anthony Decl.") ¶ 4, ECF No. 16-2.  On June 25, 1996, C. Anthony was at her parents' house to share that she was pregnant with her first child when the entire family heard of the attack at Khobar Towers, where G. Anthony was stationed. *Id.* ¶ 7.  Both C. Anthony and her parents experienced anxiety while awaiting news about whether George had been injured.  *Id.* ¶¶ 8–9.  One day later, C. Anthony received news that G. Anthony had been injured but did not know the full extent of his injuries.  *Id.* ¶ 10.  Upon G.

Anthony's return home, C. Anthony sensed that he carried "deep psychological scars" and that he was a different person. *Id.* ¶ 11.  C. Anthony felt G. Anthony became "closed off" and reports that although the two remain close, their relationship is not the same as it was before the bombing. *Id.* ¶ 12.

Alfred Anthony (A. Anthony) is the brother of G. Anthony.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. Alfred Anthony (Nov. 17, 2023) ("A. Anthony Decl.") ¶ 4, ECF No. 16-2.  On the day of the Khobar Towers attack, A. Anthony received a phone call from his father, who informed him that an explosion had occurred where G. Anthony was housed. *Id.* ¶ 9.  A. Anthony subsequently went home to be with his parents and C. Anthony before ultimately receiving a phone call informing them that G. Anthony had survived. *Id.* ¶ 11.  When G. Anthony returned, A. Anthony "realized [G. Anthony] had changed" and became less communicative. *Id.* ¶ 12.  To this day, A. Anthony feels that "we lost a piece of him that never came back." *Id.*

### 7.  *Michael W. Bass*

On June 25, 1996, Michael W. Bass was an Air Force communications specialist who was housed at the Khobar Towers complex.  Pls.' Mot., Ex. 1, Pls.' Decls., Decl. Michael W. Bass (Oct. 31, 2023) ("M. Bass Decl.") ¶ 3, ECF No. 16-2.  The night of the attack, Bass was working a night shift at a mobile communications center a few miles from Khobar Towers. *Id.* ¶ 4.  The blast caused Bass's building to shake and "startled and scared" him. *Id.*  When Bass went outside, he noticed "the glow in the sky from the direction of the Khobar Towers" and a "mushroom cloud of smoke rising in the darkness." *Id.*  He returned to Khobar Towers later that morning and witnessed the destruction that the attack had caused, including many of his wounded friends. *Id.* ¶ 5.  These scenes caused Bass great anxiety, and some months later, he received an "Airman of the Year" award for helping restore communications after the bombing.

*Id.* ¶¶ 5–6.  Since the attack, Bass has not sought any PTSD counseling or care because of his concern that it would negatively impact his career, but the attack has nevertheless detrimentally impacted him.  *Id.* ¶¶ 8–9.  He has sleep issues, is startled by loud noises, and has trouble with personal and social relationships.  *Id.*

### D.  Procedural Background

Plaintiffs filed this lawsuit on March 24, 2023 as a related case to *Gration*.  *See* Compl., ECF No. 1; Pls.' Notice of Related Case, ECF No. 2.  Plaintiffs' subsequent request to file plaintiffs' addresses under seal, *see* Pls.' Mot. for Leave to File Pls.' Addresses Under Seal, ECF No. 3, was granted on March 27, 2023, *see* Minute Order (March 27, 2023), and plaintiffs then filed those addresses under seal on April 19, 2023, *see* Sealed Notice of Pls.' Addresses Filed Under Seal, ECF No. 6.

As discussed, *infra*, in Part III.B, Iran was properly served under the FSIA and, after failing to appear, the Clerk of the Court entered default against Iran on November 6, 2023.  *See* Clerk's Entry of Default, ECF No. 15.  Plaintiffs subsequently moved for judicial notice of prior related cases and for default judgment as to liability and damages on December 18, 2023.  *See* Pls.' Mot.  Plaintiffs filed their declarations and exhibits with that motion, *id.*, and two plaintiffs later filed supplemental declarations, *see* Suppl. Brooks Decl.; Supp. Bosin Decl.  Plaintiffs' motion for default judgment is now ripe for resolution.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  Nevertheless, "strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted

because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and thus the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by Fed. R. Civ. P. 55([d])." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under [R]ule 55([d])"). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. People's Democratic Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019).  With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust

evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (formatting modified).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Courts take uncontroverted factual allegations that are supported by admissible evidence as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014); FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory." *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted).

III.    **DISCUSSION**

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek.  These requirements are satisfied here and addressed in order below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title."  28 U.S.C. § 1330(a).  The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality" thereof.  28 U.S.C. § 1603(a).  Plaintiffs seek *in personam* relief, raising the key question whether defendant is entitled to immunity under the "state sponsor of terrorism" exception set forth in §1605A.[6]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14; *Doe v. Taliban*, No. 22-7134, 2024 WL 1814317, at *2 (D.C. Cir. Apr. 26, 2024).  Among those exceptions is the "terrorism exception," enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for

---

[6]     This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 805; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources * * * for such an act[.]'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1058 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). Plaintiffs assert jurisdiction based on the FSIA's terrorism exception. 28 U.S.C. § 1605A.

In addition to creating "a cause of action for U.S. citizens, members of the U.S. armed forces, and U.S. government employees who have been injured by foreign states' acts or sponsorship of terrorism," *Borochov*, 94 F.4th. at 1057 (citing 28 U.S.C. § 1605A(c)), the terrorism exception abrogates a foreign state's immunity when certain preconditions are met. "First, the foreign state was designated a 'state sponsor of terrorism at the time [of] the act * * * or was so designated as a result of such act[.]'" *Id*. (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)). As the D.C. Circuit has explained, "[t]his designation provision allows the Executive Branch to regulate if and when a foreign sovereign may be haled into American courts to answer terrorism allegations." *Doe v. Taliban*, No. 22-7134, 2024 WL 1814317, at *13–14 (D.C. Cir. Apr. 26, 2024); *see also Owens*, 531 F.3d at 889–93 (situating the FSIA's delegation of authority to designate state sponsors of terrorism in the President's foreign-relations powers). "Second, 'at the time [of] the act,' either a victim of the act or the claimant in the suit was an American national, a member of the U.S. armed forces, or an employee or contractor for the U.S. government acting within the scope of their employment." *Borochov*, 94 F.4th. at 1057 (citing 28 U.S.C. § 1605A(a)(2)(A)(ii)).[7]

---

[7] A third precondition for the terrorism exception to apply is that "if 'the act occurred in the foreign state against which the claim has been brought,' the claimant gave the foreign state a 'reasonable opportunity' to arbitrate prior to filing a lawsuit," *Borochov*, 94 F.4th at 1057 (citing 28 U.S.C. § 1605A(a)(2)(A)(iii)), but the attack at issue here took place in Saudi Arabia, not Iran, so this requirement is inapplicable.

Plaintiffs satisfy each of the applicable elements here.  As stated above, Iran was designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers bombing.  All of the plaintiffs have averred in sworn declarations that they were U.S. citizens at the time of the attack.[8]  Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which defendant provided "material support or resources."  28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors").

More specifically, the truck bombing that plaintiffs allege caused their injuries was an "extrajudicial killing" resulting in the deaths of nineteen American military personnel.  *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendant[] constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins I*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 WL 619925 at *13 (same).  The term "extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which defines the term as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

Furthermore, this Court takes judicial notice of the evidence presented in *Blais* and *Heiser I*, demonstrating that defendant provided "material support or resources" for this

---

[8]      D. Thole Decl. ¶ 2; J. Thole Decl. ¶ 2; Balcom Decl. ¶ 2; Manrique Decl. ¶ 2; Hughes Decl. ¶ 2; Bass Decl. ¶ 2; Brooks Decl. ¶ 2; Bosin Decl. ¶ 2; C. Anthony Decl. ¶ 2; A. Anthony Decl. ¶ 2.

extrajudicial killing.  As is clear from the evidence in those cases, described *supra* in Part I.A–B,

defendant authorized, "organized and sponsored" the Khobar Towers attack.  *Heiser I*, 466 F.

Supp. 2d at 262.  The evidence shows that defendant helped to recruit, train, fund, supply, and

direct Saudi Hezbollah.  This establishes that defendant's actions were "a 'substantial factor' in

the sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were

"'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."

*Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining

that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate

cause).

Accordingly, under 28 U.S.C. § 1605A, defendant is not immune from this suit, and

subject-matter jurisdiction may be properly exercised.  *See* 28 U.S.C. § 1330(a).

## B.  Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over

which the district courts have jurisdiction . . . where service has been made under section 1608 of

[the FSIA]."  28 U.S.C. § 1330(b).  Section 1608 first prescribes two methods by which service

shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available"

to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C.

2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as

"defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered

into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F.

Supp. 3d 64, 78 (D.D.C. 2017).

Plaintiffs attempted service under § 1608(a)(3) by sending two copies of the summons,

complaint, notice of suit, and the FSIA, along with a translation of each into Iran's official

language by certified or registered mail to Iran's Ministry of Foreign Affairs.  *See* Aff. Requesting Foreign Mailing, ECF No. 7.  Plaintiffs then transmitted the same documents under the cover of diplomatic notes, following the procedure for service provided by 28 U.S.C. § 1608(a)(4), and Iran was thus served on August 28, 2023.  *See* Return of Service/Aff. of Summons and Complaint Executed, ECF No. 13.  On September 25, 2023, the U.S. Department of State certified in an Affidavit of Service that the requirements for diplomatic service under 28 U.S.C. § 1608(a)(4) were met by causing delivery of a Summons, Complaint, and Notice of Suit to Iran on August 28, 2023.  *See* Aff. of Service at 1.

Accordingly, this Court has personal jurisdiction over Iran because plaintiffs effectively executed service under 28 U.S.C. § 1608(a)(4).

### C.  Defendant's Liability

Plaintiffs seek relief under FSIA § 1605A(c), which creates a private right of action for "personal injury or death," and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* Compl. ¶¶ 23–28 (Count I).  Yet Section 1605A(c) does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages.  Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see Heiser II*, 659 F. Supp. 2d at 24 (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley*, 75 F. Supp. 3d at 335.  As such, defendant's liability is discussed in detail below, starting with the six servicemember plaintiffs.

### 1. *Servicemember Plaintiffs*

The six servicemember plaintiffs bring their claims under theories of assault, battery, and intentional infliction of emotional distress.  As discussed in the damages section, these plaintiffs may recover under only one theory, *see, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'") (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)), but each theory of liability is nevertheless evaluated.

### a. *Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results."  RESTATEMENT (SECOND) OF TORTS § 13.  "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness."  *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms).  Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing.  *See, e.g., Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm).  Three servicemember plaintiffs—D. Thole, J. Thole and Manrique—were in the Khobar Towers complex at the time of the attack and suffered harmful physical contact resulting from the explosive force of the blast and therefore defendant is liable to them for battery.[9]

---

[9]    Three servicemember plaintiffs were inside one of the targeted buildings in the Khobar Tower and suffered direct physical injuries from the blast.  *See* D. Thole Decl. ¶¶ 7–14 (cuts to body from glass shards); J. Thole Decl. ¶¶ 5, 7, 12 (severing of tendons of right hand and scars on face due to glass shards); Manrique Decl. ¶¶ 5, 7–8 (exposure to deafening noises and blast wave from shattering glass).

Assault occurs where a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2. Three of the six servicemember plaintiffs were not inside nor in the immediate vicinity of the Khobar Towers at the precise time of the attack, but were at their assigned job posts a few miles or kilometers away. These three servicemember plaintiffs—Bass, Brooks and Bosin—may have had significant apprehension of harm as they felt, heard, and saw the blast in the distance, but nonetheless do not present valid claims for assault because they were not within "striking distance" of the blast. *Id.*[10]

### b.   *Intentional Infliction of Emotional Distress*

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C.

---

[10]   Three additional servicemember plaintiffs were located a few miles from the blast site. *See* Bass Decl. ¶ 4 (located at Air Base a few miles from the blast site, and felt the blast hit the building); Brooks Decl. ¶ 5 (stationed at an air base a few kilometers away and was shaken by the sound of the blast); Bosin Decl. ¶ 5 (stationed at a hangar a few miles from Khobar Towers and felt the ground and building shake).

2009); *see also Valore*, 700 F. Supp. 2d at 77 (same).  All six servicemember plaintiffs have

demonstrated through their sworn statements that they suffered severe emotional and

psychological stress as a result of the attack, with three of those servicemember plaintiffs—

Manrique, Brooks, and Bosin—providing corroborating submissions of their formal PTSD

diagnoses as a result of the attack.[11]  Defendant is liable to all six servicemember plaintiffs for

IIED.

### 2.   *Servicemember Victims' Family Members*

The remaining four plaintiffs—Gail Ann Balcom, Maria Hughes, Alfred Anthony, and

Cynthia Anthony—seek to collect damages as family members of servicemember plaintiffs

present in Saudi Arabia for the Khobar Towers bombing.

The family members' theory of liability is IIED.  Compl. ¶¶ 35–40 (Count III).  The

Restatement permits recovery for those who were not a direct target of a defendant's conduct if

(1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional

harm upon a person [who] is not present" and (2) the claimant is a member of a victim's

immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF

TORTS § 307, at 834 (2000)), or the functional equivalent of an immediate family member, *see*

*Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under

the FSIA for IIED to "members of the victim's household" who were also "viewed as the

functional equivalents of immediate family members"); *see also* RESTATEMENT (SECOND) OF

TORTS § 46, cmt. *l* (leaving "open the possibility of situations in which presence . . . may not be

required").

---

[11]      *See* D. Thole Decl. ¶¶ 18-19; J. Thole Decl. ¶ 14; Manrique Decl. ¶¶ 9-11; Bass Decl. ¶¶ 7-10; Brooks
Decl. ¶¶ 11-16; Bosin Decl. ¶¶ 10-13.

All four of these plaintiffs are immediate family members—parents, spouses, children, and siblings—of victims, and thus able to maintain claims for IIED.  *See Fritz*, 324 F. Supp. 3d at 63 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).

In summary, the servicemember plaintiffs and the immediate-family member plaintiffs have established the defendant's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.

### D.  Damages

Turning to the allowable damages, all plaintiffs seek compensatory damages for pain and suffering, under 28 U.S.C. § 1605A(c), and the family member plaintiffs seek solatium damages, under 28 U.S.C. § 1605A(c).  Compl. ¶¶ 39–40, 43–44.  Plaintiffs also request pre-judgment interest, punitive damages, costs, and fees.  *Id.* ¶¶ B–D.  Thus, the damage award to which each plaintiff is entitled is described below.

### 1.  *Legal Standard for Damages Under Section 1605A(c)*

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages."  28 U.S.C. § 1605A(c).  To recover, plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C.

2008).  The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that plaintiffs' injuries were reasonably certain and were the intended consequences of defendant's material support of Saudi Hezbollah. *See Schooley*, 2019 WL 2717888, at *74 (concluding the same); *Akins*, 332 F. Supp. 3d at 39 (same).  Having concluded this, whether plaintiffs have shown the amount of pain and suffering, solatium, and punitive damages by a reasonable estimate will be considered next.[12]

### 2.  Pain and Suffering

As discussed, defendant is liable to three servicemember plaintiffs for battery and assault and for intentional infliction of emotional distress, but the bar on multiple recoveries allows these plaintiffs to recover only under one theory, for the single underlying harm.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").  Within this single-recovery framework, the "baseline assumption," *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016), applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages."  *Id.* (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)).  The baseline may be adjusted either upward or downward.  An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'"  *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at

---

[12]     The FSIA's private right of action permits plaintiffs to seek "economic damages," 28 U.S.C. § 1605A(c), but plaintiffs have not included such a request in their prayer for relief.  *See generally*, Compl.

84).  A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'"  *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify.  In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each servicemember plaintiff."  *Schooley*, 2019 WL 2717888, at *74.  That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service."  *Id.* (internal quotation marks omitted).  As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards.  *Id.*; *cf. Peterson*, 515 F. Supp. 2d at 54 (in calculating damages, "the Court must take pains to ensure that individuals with similar injuries receive similar awards").  *Schooley*'s basic rubric is adopted in this case for the two servicemember plaintiffs with relevant VA disability ratings.  *See Ackley*, 2022 WL 3354720, at *51 (using *Schooley*'s "basic rubric" of VA disability ratings to calculate damages amounts); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same).  Thus, servicemember plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000.  *See Ackley*, 2022 WL 3354720, at *51 (using this approach); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same).

Servicemember plaintiff Juan Antonio Manrique, is entitled to recover in the 40–60% disabled category, as he received a 50% disability rating from the VA for PTSD that he suffers from as a result of the Khobar Towers bombing.  Manrique Decl. ¶ 11; *see id.*, Ex. A (VA Benefit Information).  He is thus entitled to an upward departure from the baseline award, for a total award of $6,000,000 for his pain and suffering as a survivor of the bombing. Servicemember plaintiff John D. Brooks is also entitled to recover in the 40–60% disabled category, as he received a 50% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  Suppl. Brooks Decl. ¶ 5.  He is thus also entitled to an upward departure from the baseline award, for a total award of $6,000,000 for his pain and suffering as a survivor of the bombing.

Four servicemember plaintiffs did not seek or have not received VA disability ratings: David E. Thole, Joan M. Thole, Mike Bass, and Darrin J. Bosin.  Nonetheless, review of two of these four plaintiffs' "uncontroverted factual allegations" in their affidavits, *Roth*, 78 F. Supp. 3d at 386, and, where available, exhibits, demonstrates that they each suffered severe physical injuries and chronic psychological pain.  *See Valore*, 700 F. Supp. 2d at 83–84; *see also* D. Thole Decl. ¶¶ 9, 13, 17–19 (describing that the explosion and glass shards caused him to "bleed[] profusely," for which he received a Purple Heart, and caused him ongoing psychological after-effects) and J. Thole Decl. ¶¶ 9, 12, 13–15 (explaining that flying glass caused "the tendons of the middle two fingers of [her] right hand" to be severed, for which she received a Purple Heart, and that she suffers from ongoing symptoms of PTSD).  Although they have not applied for VA disability benefits or alleged that they suffer from any significant disability as a result of the Khobar Towers attack, these two plaintiffs are entitled to the baseline assumption award of

$5,000,000 for the significant physical injuries they sustained as a result of the bombing and the psychological symptoms they have suffered since.

The remaining two servicemember plaintiffs—who were a few miles from the blast site at the time of the attack but returned to the site to assist the wounded, clean-up the complex, and assist with sending the bodies of their fallen comrades home—allege only chronic psychological pain.  *See* Bosin Decl. ¶¶ 10–13 (describing that he suffers from ongoing PTSD and that his life has caused permanent changes in his personality); Bass Decl. ¶¶ 8–10 (describing that the attack "had a deep and possibly detrimental impact" and has "left [him] with mental scars").  Where injuries are "comparatively minor," *Schooley*, 2019 WL 2717888, at *75, or "primarily emotional," *Valore*, 700 F. Supp. 2d at 84, courts have tended to adjust damages awards downward.  *See Ackley*, 2022 WL 3354720, at *51 (adjusting from baseline award of $5,000,000 to $3,000,000 to account for relative severity of injuries); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d at 13 (D.D.C. 2012) (reducing award from $3,000,000 to $1,500,000).  Such a downward adjustment is appropriate for plaintiffs Bass and Bosin, neither of whom sustained any immediate physical injuries from the bombing but, due to their return to the Khobar Towers complex to help care for the wounded, suffer from significant long-term psychological injuries.  Bass and Bosin are thus each entitled to an award of $3,000,000 for their pain and suffering as survivors of the bombing.

### 3.  *Solatium*

The remaining plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims.  *See* Compl. ¶¶ 41–44.  "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but

solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where awards are valued at half of the awards to family members of the deceased" (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased.").  "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED."  *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) (Contreras, J.); *see also Fraenkel*, 892 F.3d at 357.  Damages recoverable on immediate-family member plaintiffs' claims of IIED thus will be discussed as a claim for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium."  *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30).  In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium."  *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)).  Although not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted." (emphasis in original)), the *Heiser* framework is adopted here for

consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia*, 774 F. Supp. 2d at 15. "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85. Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at 39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), and siblings of surviving victims receive $1,250,000, *see Valore*, 700 F. Supp. 2d at 85.

These numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011); *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have discretion . . . to grant solatium awards based on the particular facts of each case, subject to

abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").

Here, the only spouses are plaintiffs D. Thole and J. Thole, who also claim that they have experienced IIED as a result of witnessing each other's injuries.  They have each already prevailed on their battery and IIED claims above, however, and may only recover under one theory of liability. Thus, neither D. Thole or J. Thole is entitled to additional recovery on a theory of solatium.

Damages for plaintiff parents are addressed first, followed by siblings.

### a.   *Parents*

One of the immediate-family member plaintiffs will receive an award as the parent of a servicemember who was stationed at the Khobar Towers at the time of the bombing: Maria V. Hughes.  Her harms are consistent with those suffered by many parents of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16; Hughes Decl. ¶¶ 9–12.  Her son was in the Khobar Towers complex when the blast went off, and was awarded a 90% disability rating from the VA, 50% of which is attributed to PTSD that he suffers from as a result of the Khobar Towers attack. Manrique Decl. ¶¶ 7–11. Parents of the injured service-members are each entitled to a baseline award of $2,500,000 under the *Heiser* framework.  *See Akins I*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service-members).  Here, Maria V. Hughes, whose child was awarded $6,000,000, will receive an award of $2,500,000.

### b.   *Siblings*

Three of the immediate family member plaintiffs are siblings of servicemember plaintiffs: Gail Ann Balcom, Cynthia M. Anthony, and Alfred Anthony.  Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack

on their respective siblings and families.[13]  These harms are consistent with those suffered by many siblings of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 15.  Within the *Heiser* framework, siblings of injured servicemembers awarded between $5,000,000 and $7,000,000 are each entitled to an award of $1,250,000, with no downward departure for proportionality required.  *See Akins I*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service-members).

### E. Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c).  *See* Compl. ¶¶ 45–48 (Count V); *id.*, Prayer for Relief ¶ B.  The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).  Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in the [other] methods" for determining punitive damages. 2020 WL 3606273, at *27. Specifically, *Christie* determined that this method avoided "a singular focus on deterrence," *id.* at *28, as well as "elevat[ing] superficial similarities over meaningful ones" and "skim[ing] over analysis of the plaintiffs' precise harms," and does not "yield an excessive award," *id.*  Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.*, "'the

---

[13]      Balcom Decl. ¶¶ 7-10; C. Anthony Decl. ¶¶ 7-12; A. Anthony Decl. ¶¶ 9-12.

compensatory damages for the injury suffered' . . . [were] 'based on a component which' would
be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding
hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by
Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the
present case, the *Christie* punitive damages approach analysis, which was likewise applied in
several other cases in this district, *see, e.g.*, *Blank*, 2021 WL 3021450, at *10, *Ackley*, 2022 WL
3354720, at *60, will also be applied here. Plaintiffs urge no alternative approach. *See* Pls.'
Mem. at 20. Accordingly, a punitive damages award equal to compensatory damages is most
appropriate. Plaintiffs are entitled to a total punitive damages award of $34,250,000 to be
apportioned among plaintiffs according to their compensatory damages. *See also Valore*, 700 F.
Supp. 2d at 90 (apportioning in the same fashion).

### F.  Prejudgment Interest

Plaintiffs next seek prejudgment interest. Compl., Prayer for Relief ¶ C; *see also* Pls.'
Mem. at 20–21. "Whether to award such interest is a question that rests within this Court's
discretion, subject to equitable considerations." *Oveissi II*, 879 F. Supp. 2d at 58. At the same
time, the majority of Judges on this Court confronted with this issue have concluded—as this
Court did in *Akins I*—that "pain and suffering and solatium damages are both designed to be
fully compensatory" and prejudgment interest is therefore unwarranted. *See Barry v. Islamic
Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian
Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see Doe A-1 v. Democratic People's
Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021)
(Friedrich, J.) (denying prejudgment interest because the award "in *today's dollars* fully

compensates the crew members and their estates for their time spent in captivity" (emphasis in original)); *Bathiard v. Islamic Republic of Iran*, Case No. 16-cv-1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), *adopted by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54–55 (D.D.C. 2016) (Howell, J.).  Thus, the overarching tide of persuasive precedent in this District plainly weighs against awarding prejudgment interest, and is even less warranted considering punitive damages are permissible in § 1605A cases, as prejudgment interest "does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory."  *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42).

Consistent with this persuasive precedent, this Court concludes plaintiffs are not entitled to prejudgment interest on their compensatory or punitive damages.  When denying prejudgment interest on compensatory damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack."  *Oveissi I*, 768 F. Supp. 2d at 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54.  Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'"  *Id.* (quoting *Wyatt*,

908 F. Supp. 2d at 232).  As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by th[at] [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins I*, 332 F. Supp. 3d at 46 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)).  Plaintiffs are likewise not entitled to prejudgment interest on their punitive damages.  "[P]rejudgment interest does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42).  Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

IV.    **CONCLUSION**

For the foregoing reasons, plaintiffs' motion for default judgment and damages is granted.  Defendant is liable for the pain and suffering inflicted on the six service-member plaintiffs, for the emotional distress inflicted on the four immediate family member plaintiffs of these and other servicemember plaintiffs, and for punitive damages equal to compensatory damages.

Plaintiffs are awarded compensatory and punitive monetary damages in the following amounts:

1.    Servicemember plaintiffs Juan Antonio Manrique and John D. Brooks, who each suffered injuries resulting in VA disability ratings between 40–60%, are entitled to $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages;

2.      Servicemember plaintiffs David E. Thole and Joan M. Thole, who each suffered severe physical and psychological injuries, are each entitled to $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages;

3.      Servicemember plaintiffs Michael W. Bass and Darrin J. Bosin, who each suffered severe psychological injuries, are entitled to $3,000,000 in pain and suffering damages and $3,000,000 in punitive damages;

4.      Plaintiff parent Maria V. Hughes is entitled to $2,500,000 in solatium damages and $2,500,000 in punitive damages;

5.      Plaintiff siblings Gail Ann Balcom, Cyntia M. Anthony, and Alfred Anthony are each entitled to $1,250,000 in solatium damages and $1,250,000 in punitive damages.

Thus, the total damages award is $68,500,000.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

DATE: May 16, 2024.

_____
**BERYL A. HOWELL**
United States District Judge